IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALLIANCE BANK, : 
 : 
      Plaintiff, : 
 :    CIVIL ACTION
   v. : 
 :    NO. 10-2249
NEW CENTURY BANK, : 
 : 
      Defendant. : 

## OPINION

Slomsky, J.                                                         July 27, 2010

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................ 3

II.    FINDINGS OF FACT ........................................................ 4
     A.    The Parties ......................................................... 4
     B.    Alliance's Products and Services ..................................... 5
     C.    Alliance's Mark CUSTOMER FIRST .................................. 6
          i.    Advertising CUSTOMER FIRST ............................. 6
          ii.   Registration of Mark CUSTOMER FIRST ..................... 9
     D.    New Century's Products and Services .................................. 9
     E.    New Century's Mark CUSTOMERS 1ST BANK ....................... 10
          i.    Advertising CUSTOMERS 1ST BANK ........................ 10
          ii.   Attempted Registration of Mark CUSTOMERS 1ST BANK
              and Similar Marks ...................................... 12
     F.    New Century's Name Change .......................................14
     G.    Commonality of "Customer" and "First" in the Banking
          and Financial Industries .............................................16

III.   LEGAL STANDARD ...................................................... 17
     A.    Jurisdiction ........................................................ 17
     B.    Preliminary Injunction ............................................. 17

IV.   CONCLUSIONS OF LAW ................................................. 18
     A.    Alliance is Likely to Succeed on the Merits of its Trademark Claim ....... 20
          i.    Alliance Owns a Valid and Legally Protectable Service Mark ...... 20
              a.    Alliance Did Not Fraudulently Obtain the Mark ............ 26
              b.    Third Party Usage ...................................... 29

| | | | |
|---|---|---|---|
| | c. | The Doctrines of Non-Use, Mutilation, and Abandonment are Inapplicable ........................ 32 | |
| | ii. | New Century's Use of the Name Customers 1st Bank Creates a Likelihood of Confusion .......................... 34 | |
| | a. | Factor 1: Similarity of the Marks ...................... 36 | |
| | b. | Factor 2: Strength of the Mark ........................ 40 | |
| | c. | Factor 3: Care and Attention Expected of Consumers ....... 43 | |
| | d. | Factor 4: Length of Time Defendant Has Used the Mark ..... 45 | |
| | e. | Factor 5: Intent of Defendant ........................ 45 | |
| | f. | Factor 6: Evidence of Actual Confusion .................. 49 | |
| | g. | Factor 7: Whether Goods Are Marketed Through the Same Channels and Factor 8: Extent to Which Targets of the Parties' Sales Efforts are the Same ................. 50 | |
| | h. | Factor 9: Relationship of the Goods in the Minds of Consumers ................................ 51 | |
| | i. | Factor 10: Other Facts Suggesting the Public Might Expect the Prior Owner to Manufacture Both Products ...... 52 | |
| | j. | Balancing of Factors ............................... 52 | |
| B. | | Irreparable Harm to Alliance ...................................... 53 | |
| C. | | Irreparable Harm to New Century ................................... 55 | |
| D. | | The Public Interest ............................................. 56 | |
| V. | | ALLIANCE IS REQUIRED TO POST A BOND ........................... 56 | |
| VI. | | CONCLUSION ................................................. 56 | |

## I.    INTRODUCTION

Before the Court is Plaintiff Alliance Bank's Motion for Preliminary Injunction (Doc. No. 2). On May 14, 2010, Plaintiff Alliance Bank ("Alliance") commenced this action against Defendant New Century Bank ("New Century") alleging claims for trademark infringement, false designation of origin, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, and for violations of state law of the Commonwealth of Pennsylvania. These claims arise from New Century's recent adoption and use of the name CUSTOMERS 1ST BANK in connection with banking and financial services. On the same day that Alliance filed the Verified Complaint (Doc. No. 1), Alliance also filed a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a).

On June 2, 2010, Defendant New Century filed a Response in Opposition to the Motion for Preliminary Injunction (Doc. No. 16). On June 9, 2010, Alliance filed a Reply in Support of the Motion (Doc. No. 17). On June 17 and 18, 2010, the Court held a hearing on the Motion for Preliminary Injunction.[1] In addition, on June 29, 2010, the Court held oral argument on the Motion. After considering the testimony and exhibits offered by the parties at the hearings and their filings and arguments in this case, and for the reasons that follow, the Court will grant Alliance's Motion for Preliminary Injunction.

---

[1]At the hearing, Plaintiff Alliance Bank presented testimony from Dennis Cirucci, President and Chief Executive Officer ("CEO") of Alliance Bank. Defendant New Century Bank presented testimony from Richard Ehst, President and Chief Operating Officer ("COO") of New Century, and Warren Taylor, Executive Vice President and President of Community Banking of New Century.

## II.    FINDINGS OF FACT

### A.    The Parties

Plaintiff Alliance Bank is a Pennsylvania corporation with its principal place of business located at 541 Lawrence Road, Broomall, Pennsylvania. (Verified Complaint at ¶ 3; Testimony of Dennis Cirucci ["Cirucci"], Plaintiff's President and CEO, Transcript of Hearing, June 17, 2010 ["Tr. 06/17/10"], at 5:15-16.) Alliance is a wholly owned subsidiary of Alliance Bank Corp. of Pennsylvania, and renders community banking services to individuals and businesses. (Id. at 5:6-7, 17-24; 43:7-8.) Alliance has branches in Delaware County and Chester County, Pennsylvania. Branches are located in the towns of Lawrence Park, Concordville, Havertown, Springfield, Lansdowne, Secane, Newtown Square, Upper Darby, and Paoli. (Plaintiff's Declaration of Dennis Cirucci (Doc. No. 11) Exhibit ["Cirucci Ex."] 45.) Customers of Alliance are located in forty-one (41) states and in Puerto Rico. (Cirucci, Tr. 06/17/10 at 28:12-16.) A large percentage of Alliance's business is conducted over the internet. (Id. at 32:1-3.)

Defendant New Century, d/b/a Customers 1st Bank, is a Pennsylvania corporation with its principal place of business located at 99 Bridge Street, Phoenixville, Pennsylvania. (Plaintiff's Hearing Exhibit ["Pl. Ex."] 46 at ¶3.) New Century also offers community banking services to individuals and businesses. (Testimony of Warren Taylor ["Taylor"], Defendant's Executive Vice President and President of Community Banking, Tr. 06/17/10 at 291:22-24.) Like Alliance, New Century has branches in Delaware County and Chester County, Pennsylvania. Branches are located in the towns of Phoenixville, Kimberton, Newtown Square, Wayne, and Malvern. (Pl. Ex. 46 at ¶3.) With the exception of the Newtown Square branch, which is directly across the street from a branch of Alliance, all of New Century's branches are located more than three and one half (3.5) miles away

4

from an Alliance branch. (Taylor, Tr. 06/17/10 at 203:9-17; Cirucci, Tr. 06/17/10 at 31:6-12.) New Century also provides on-line banking services. (Testimony of Richard Ehst ["Ehst"], Defendant's President and COO, Tr. 06/17/10 at 173:20-22.) Approximately seventy-five percent (75%) of New Century's customers reside within one-mile of a branch location, and the other twenty-five percent (25%) "could be just about anywhere." (Id. at 203:8.)

B.    Alliance's Products and Services

Alliance is a "community bank," which is a financial institution formed to serve the constituents of the communities in which it exists. (Cirucci, Tr. 06/17/10 at 45:17-46:1.) Alliance provides a full range of banking services, including checking and savings accounts, certificates of deposits, online banking, loan products such as mortgage loans, home equity loans, commercial loans and lines of credit, and other related products and services customary in the banking industry. (Id. at 5:17-24; 6:3-9.) Alliance's customers consist of individuals and businesses residing in Delaware and Chester Counties, as well as individuals residing in Bucks County, Pennsylvania. (Id. at 28:14-16.) These customers include small and large businesses, non-profit entities, municipalities, governmental units, families, seniors and retirees. (Id. at 43:17-44:3.)

Alliance offers three (3) types of checking accounts: (1) "Affordable Checking," (2) "Customer First Checking," and (3) "Off To College Checking." (Id. at 53:9-18.) The "Customer First Checking" account is Alliance's primary retail product. (Id. at 8:25-9:1.) Currently, Alliance has approximately four thousand (4,000) "Customer First Checking" accounts in use with deposits of approximately $45,000,000. (Id. at 9:8-14.) In total, from 2007 until March 2010, Alliance's deposits have grown by $56,000,000 or sixteen percent (16%). (Testimony of Cirucci, Transcript of Hearing, June 18, 2010 ["Tr. 06/18/10"] at 10:8-12.)

5

C.    Alliance's Mark CUSTOMER FIRST

    i.    Advertising CUSTOMER FIRST

Since March 2006, Alliance has been using the mark CUSTOMER FIRST in two respects: (1) to identify all of its banking services as a whole and (2) to identify one of its products, "Customer First Checking." (Cirucci, Tr. 06/17/10 at 7:14-8:8.) A Customer First Checking Account gives consumers a preferred rate on other products of Alliance. (Id. at 17:17-23.) Mr. Cirucci provided extensive and creditable testimony as to how the Customer First Checking Account "serves as the hub for all of [Alliance's] other related products," and how it "acts as a bridge and brings them together." (Id. at 8:24-9:7; 17:3-23; 22:23-23:6; 62:12-21.) As he explained, Alliance uses the Customer First Checking Account as the centerpiece of the bank, and all other banking products act as "spokes" stemming from the center. (Id. at 153:1-14.) For example, products such as safety deposit boxes, home equity loans, and mortgage loans are tied to a consumer's Customer First Checking Account. If a customer rents a safety deposit box, the yearly fee would be paid from the Customer First Checking Account. If a customer has an ATM or debit card, it would be tied to the Customer First Checking Account. If a customer has a home equity or mortgage loan, payments would be made from the Customer First Checking Account. (Id. at 17:7-23.)

Alliance considers the mark to be a valuable symbol of the bank's representation to its customers and goodwill. (Id. at 11:7-10.) CUSTOMER FIRST is spelled using an ordinary font, and Alliance often uses a blue and yellow color scheme in conjunction with its general advertising and this specific mark. (Id. at 60:5-9.) Sometimes Alliance advertises in black and white rather than in color. (Id. at 60:16-17.)

6

Alliance has publicized CUSTOMER FIRST in a variety of ways. For example, in 2006, Alliance placed advertisements promoting its CUSTOMER FIRST banking services on four-foot (4') by five-foot (5') posters at about two-dozen bus shelters throughout the Delaware Valley. (Id. 24:16-25:19; 162:5-8; Pl. Ex. 2.) Bus shelter advertisements featured the slogan, "Customer First Banking Just Hit Home." (Pl. Ex. 2; Cirucci, Tr. 06/17/10 at 24:22-25:14.) These advertisements were displayed for at least one year and cost $5,300 every month. (Id. at 25:2-14; Pl. Ex. 6-37.)

Over the past four (4) years, Alliance has also promoted CUSTOMER FIRST in local newspapers, such as the Philadelphia Inquirer, Delaware County Times, News of Delaware County, and the Daily Local News. (Id. at 12:19-24; 15:10-18; 21:17-22:4; 103:24-104:3.) In addition, Alliance has sent direct mailings to advertise the bank and its mark through a company called "ValPak." (Id. at 13:3-18.) ValPak is a direct mail marketing company that does mailings to households across the United States, including the Delaware Valley. (Id.)

Alliance also operates and maintains a website, through which it distributes news and information regarding its banking services and products, and where the mark CUSTOMER FIRST is prominently displayed. (Id. at 12:11-14; Pl. Ex. 6-4.) Finally, Alliance has publicly displayed the mark CUSTOMER FIRST in connection with its banking services and checking account in and around its branches and operations, through signage, television screen shots and promotional items. For approximately eighteen (18) months, until the fall 2007, Alliance required lapel pins labeled CUSTOMER FIRST to be worn by employees who personally served the public, such as customer service representatives, bank tellers, branch managers and assistant managers. (Id. at 11:22-25; 12:1-6; 13:19-15:8; 25:15-19; 26:2-23; 37:1-38:18; 66:22-25; Pl. Ex. 24.)

7

Alliance extensively promotes CUSTOMER FIRST in brochures available to the public. In one brochure, an entire page is dedicated to the Customer First Checking Account. The page reads:

> Choosing the right checking account is easy at Alliance Bank.
>
> Customer First™ Checking - At Alliance Bank, we believe in putting the customer first. After all life can be complicated, choosing what type of checking account to open shouldn't be. Our Customer First™ Checking gives you all you want from a checking account in one easy package.

(Pl. Ex. 6-1 at 4.) In a tri-fold brochure that describes the different accounts offered by Alliance, one page features the phrase "Customer First™ Checking" multiple times. (Pl. Ex. 6-2.) This tri-fold brochure is often distributed at area events to promote Alliance's products. (Cirucci, Tr. 06/17/10 at 12:2-6.) In another document, a one-page advertisement mailed to over one-hundred thousand (100,000) households, a description of "Customer First™ Checking" covers a substantial portion of the page. (Id. at 13:4-6; Pl. Ex. 6-8.) In yet another one-page advertisement, the center of the page reads "Customer First™ Checking" and is followed by rates offered on Customer First Checking Accounts. (Pl. Ex. 6-19.) In many advertisements, a small "™" or "®," indicating a protectable trademark, is featured after the mark CUSTOMER FIRST.

In 2006, Alliance spent approximately $310,000 on advertisements that include either the term "Customer First Checking" or the slogan "Customer First Banking Just Hit Home." (Pl. Exs. 6, 1-36.) In total, over the past four (4) years, Alliance has spent more than $500,000 on advertising and marketing throughout its trade area in order to promote its CUSTOMER FIRST banking services and the Customer First Checking Account. (Cirucci, Tr. 06/17/10 at 8:9-19.) Alliance continues to advertise under the mark CUSTOMER FIRST for banking services. (Id. at 8:20-23.) All advertisements featuring CUSTOMER FIRST also include the housemark ALLIANCE BANK (in

8

a larger font) and several advertisements also feature the slogan "We Build Relationships That Last." (Id. at 61:25-62:7; 115:12-15; 125:3-6.) However, Alliance considers CUSTOMER FIRST to be the "defining characteristic" of the bank. (Id. at 51:19.)

ii. Registration of Mark CUSTOMER FIRST

On August 1, 2005, Alliance filed an application for registration of the mark CUSTOMER FIRST in the United States Patent and Trademark Office ("USPTO"). As part of the application, Mr. Cirucci signed a Statement of Use which declared that the term CUSTOMER FIRST was in use in connection with all of the following services: "Services customary in the banking industry, namely, banking, banking consultation, investment banking services, mortgage and personal banking services, namely, origination, acquisition servicing, securitization, and brokerage of commercial and personal mortgage loans and online banking services." (Cirucci, Tr. 06/17/10 at 7:8-13.) On October 16, 2007, the mark was approved and registered in the USPTO on the Principal Register under Certificate of Registration No. 3,313,156. (Verified Compl. at ¶¶ 11-13; Pl. Ex. 23.)

D. New Century's Products and Services

New Century has been conducting business in the same area where Alliance does business since 1997. (Pl. Ex. 46 at ¶ 4.) Like Alliance, New Century is a community bank that provides services that are customary in the banking industry. (Ehst, Tr. 06/17/10 at 173:2-174:16.) New Century offers two (2) types of checking accounts: (1) "Free Checking" and (2) "Platinum Checking." (Taylor, Tr. 06/17/10 at 252:23-253:1.) New Century provides personal banking and commercial mortgage services. It does not provide residential mortgage banking services. (Ehst, Tr. 06/17/10 at 173:12-19.) Richard Ehst, New Century's current President and COO, testified that he considers New Century's customers to be sophisticated and particularly knowledgeable on the

9

products and services the bank offers. (Id. at 206:13-207:16.)

From 2008 until early 2010, New Century had not been a profitable enterprise. (Id. at 179:23-180:4.) Mr. Ehst described New Century as a "troubled company" with "significant legacy issues." (Id. at 186:1-5.) To overcome this problem, in the third quarter of 2009, New Century recruited a new management team and began redefining its business model. The new management team included Mr. Ehst, Mr. Taylor, and Jay Sidhu, who assumed the position of Chairman and CEO. The three executives previously worked together at Sovereign Bank. (Id. at 183:24-184:6; 187:16-188:25.) Their new business model included a high-tech, high-touch customer service commitment. (Taylor, Tr. 06/17/10 at 184:23-185:24.)

Since the arrival of this new leadership, New Century has raised over $67,000,000 in new equity capital. New Century now holds over $884,000,000 in total deposits and loans. (Ehst, Tr. 06/17/10 at 189:18-190:2.) In addition, customer deposits have increased one-hundred-twelve percent (112%), and since June 2009 its loans have increased over sixty percent (60%). (Id.) In May 2010, New Century raised over $500,000. (Id.)

### E. New Century's Mark CUSTOMERS 1ST BANK

#### i. Advertising CUSTOMERS 1ST BANK

In June or July 2009, discussions began at New Century about a name change. (Taylor, Tr. 06/17/10 at 232:25-233:7.) The reasons offered at the evidentiary hearing for changing the name of the bank were: (1) a desire to start fresh with a new management team, and (2) a desire to distance the name of the bank from negative publicity associated with the 2007 failure of New Century Mortgage of Irvine, California. The failure of New Century Mortgage was reported on ABC News, and Defendant New Century's logo was incorrectly used in reporting the story. (Id. at 235:1-10;

10

Ehst, Tr. 06/17/10 at 188:19-189:6.)[2]

Around January 2010, Mr. Ehst proposed the name "Customers 1st Bank." (Id. at 191:10-19.) Subsequently, Mr. Taylor searched the names "Customers 1st Bank" and "Customers First Bank" on Google and GoDaddy.com, a website that sells internet domain names. (Taylor, Tr. 06/17/10 at 241:3-18.) In February 2010, New Century submitted the name "Customers 1st Bank" to its advertising agency for production of a logo. (Ehst, Tr. 06/17/10 at 191:23-192:13.) By the end of February 2010, Mr. Taylor presented designs and logos to New Century's executive team for approval. After receiving a positive response, the executive team decided to adopt the mark CUSTOMERS 1ST BANK as its new name, and New Century began the process of changing its name (Taylor, Tr. 06/17/10 at 298:11-22.), with the exception of the New Century name on permanent signs at existing branches. These will not be changed until August 2010, when a shareholder vote on the name change is scheduled. (Ehst, Tr. 06/17/10 at 167:17-24.)

Currently, the mark CUSTOMERS 1ST is used on virtually all of New Century's advertising and marketing materials. (Pl. Ex. 17.) The logo, however, is not used in connection with one of New Century's internet domain names (e.g., www.customersfirst.com) and in connection with employee email addresses (e.g., joesmith@customersfirst.com). Both online references contain the

---

[2]In 2007, a mortgage company in Irvine, California, named "New Century Mortgage Company" filed for Chapter 11 bankruptcy. (Ehst, Tr. 06/17/10 at 169:5-19; 187:16-20.) Mr. Ehst testified that the failure of New Century Mortgage Company in California, which has no association with Defendant in this action, created confusion among an investor pool. (Id.) By 2009, Defendant New Century was still feeling the effects of New Century Mortgage Company's failure. ABC News, a national broadcasting company, while reporting the New Century Mortgage Company failure, erroneously featured a picture of New Century Bank's Phoenixville, Pennsylvania branch and, as noted, New Century Bank's logo during a televised news segment. (Id. at 188:19-25.) New Century decided to change its name to Customers 1st Bank in part to avoid confusion and association with New Century Mortgage Company. (Id. at 169:23-170:3.)

words: "customers" and "first." New Century also owns other domain names and email addresses (e.g., www.customers1stbank.com). (Taylor, Tr. 06/17/10 at 265:1-21; Ehst, Tr. 06/17/10 at 205:13-23.)

New Century Bank does ninety-nine percent (99%) of its advertising through three (3) trade channels: (1) a direct mail magazine identified as Clipper Magazine; (b) its website and other industry websites; and (c) signs displayed in branches. Some households, including Mr. Cirucci's, receive both ValPak and Clipper Magazine mailings. (Cirucci, Tr. 06/17/10 at 162:1-4.) New Century has rarely advertised in newspapers, and it does not advertise on buses or at bus shelters. (Taylor, Tr. 06/17/10 at 270:22-271:6.)

The CUSTOMERS 1ST BANK logo has a red and black color scheme. The words "Customers" and "Bank" are written in a black font. The word "1st" is featured inside a red ball with a white font. A small "SM" to signify a service mark is sometimes featured in the upper-right hand corner of the logo. (Id. at 239:7-240:4; Pl. Exs. 17, 19.)

      ii.     Attempted Registration of Mark CUSTOMERS 1ST BANK
               and Similar Marks

On or about March 9, 2010, New Century requested its lawyer to commission a Trademark Clearance Search (the "Clearance Search") from Thomson Compumark for the mark "Customers First Bank" and its equivalent (i.e., "Customers 1st Bank") for banking services. A Clearance Search Report was issued and reviewed by officials at New Century in March 2010. (Ehst, Tr. 06/17/10 at 193:25-194:11.) At that time, New Century and its executive team became aware of Alliance's trademark registration for the mark CUSTOMER FIRST because it was listed on the Clearance Search. (Id. at 172:13-173:1; 194:18-21.) After learning about the conflict in marks, Messrs. Ehst

and Taylor discussed the possibility that Alliance might challenge New Century on its adoption and use of CUSTOMERS 1ST BANK. (Id. at 174:23-177:3; Taylor, Tr. 06/17/10 at 294:16-295:1.)

Shortly thereafter, New Century received an opinion of counsel on the marks, but Mr. Ehst did not read the opinion. (Ehst, Tr. 06/17/10 at 200:1-2.) In any event, New Century did not alter any of its plans to change the bank name after reviewing the Clearance Search and receiving the opinion of counsel. (Id. at 200:23-25; Taylor, Tr. 06/17/10 at 242:16-18.)

On March 5, 2010, New Century filed several applications with the USPTO to register five variants of the mark CUSTOMERS 1ST BANK for "banking and financing services": Application Serial No. 77/952,242 (for the standard character mark CUSTOMERS 1ST BANK); Application Serial No. 77/952,243 (for the standard character mark CUSTOMERS FIRST BANK); Application Serial No. 77/952,254 (for the stylized mark YOU'RE FIRST CUSTOMERS FIRST BANK (and design)); Application Serial No. 77/952,250 (for the stylized mark CUSTOMERS 1ST BANK (and design)); and 77/952,252 (for the stylized mark CUSTOMERS 1ST BANK (and design)).[3] (Id. at 288:25-291:2; Pl. Exs. 7, 8, 9, 30, 31.)

On April 20, 2010, the USPTO refused each of New Century's five applications to register variants of the mark CUSTOMERS 1ST BANK because the marks depicted in the applications so resemble Alliance's mark CUSTOMER FIRST as to be likely to cause confusion or mistake or to deceive under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d). (Ehst, Tr. 06/1710 at 214:25-

---

[3]The difference between Application Serial Nos. 77/952,250 and 77/952,252 is that in the latter Serial No., the stylization of the mark is such that the word CUSTOMER is "stacked" on top of the words 1st and Bank; in the former Serial No., the words appear in the same line. Otherwise, the marks shown in these applications are the same.

215:6; Pl. Exs. 7, 8, 9, 30, 31.)[4]

F. New Century's Name Change

On April 23, 2010, it was reported in the media that a bank with the name "New Century Bank" located in Chicago, Illinois, had been seized and placed into receivership. When Chairman Jay Sidhu learned of this takeover and the similarity of the name to his own bank, he directed Messrs. Taylor and Ehst to immediately change the name of their bank from New Century to Customers 1st Bank. (Id. at 190:25-191:6.) On April 26, 2010, New Century formally announced in a press release that it was changing its name to Customers 1st Bank. (Cirucci, Tr. 06/17/10 at 28:20-29:5; Ehst, Tr. 06/17/10 at 166:16-167:2; Pl. Ex. 14.) The bottom of the press release tersely stated: "New Century Bank Is Now Customers 1st Bank." (Id.) When the press release was issued on April 26, 2010, the executive team at New Century knew that Alliance owned a registered trademark for CUSTOMER FIRST. (Ehst, Tr. 06/17/10 at 168:24-169:4.)

When apprised of the April 26th press release, Mr. Cirucci, Alliance's President, directed attorney Paul F. D'Emilio ("D'Emilio") to send a cease and desist letter to New Century. (Cirucci, Tr. 06/17/10 at 29:20-24.) On April 30, 2010, Mr. D'Emilio sent the cease and desist letter to Mr. Taylor. (Pl. Ex. 3.) After receiving this letter, New Century continued to use Customers 1st Bank as the new name of its bank, and at no time has this use ceased. (Id. at 29:25-30:5.)[5]

---

[4]On May 19, 2010, after New Century filed a response to the declinations, the USPTO once again refused to register New Century's Application Serial No. 77/952,243, Application Serial No. 77/952,250, and Application Serial No. 77/952,252 because of the likelihood of confusion with the mark of Alliance Bank.

[5]Alliance has never authorized or consented to the use of the mark CUSTOMERS 1ST BANK by New Century. (Id. at 30:3-8.)

On May 21, 2010, a few days after New Century received a second wave of registration rejections from the USPTO, Mr. Taylor visited an Alliance branch in Paoli, Pennsylvania. (Taylor, Tr. 06/17/10 at 253:12-18.) While speaking with a customer service representative, Mr. Taylor was told that two types of checking accounts would fit his requirements: (1) Customer First Checking, which pays interest, and (2) Affordable Checking, which does not pay interest. The customer service representative also handed Mr. Taylor four (4) pieces of marketing material, including the tri-fold brochure described above that features the phrase "Customer First™ Checking" multiple times. (Id. at 254:7-25; Pl. Ex. 6-2.) Mr. Taylor testified that he reviewed the tri-fold brochure and noticed the ™ trademark symbol after the mark CUSTOMER FIRST. (Taylor, Tr. 06/17/10 at 305:23-25.) Mr. Taylor also reviewed a buck slip advertisement for home equity loans that bore the trademark symbol "®" after the phrase CUSTOMER FIRST. (Id. at 306:21-307:16; Def. Ex. 1.)

"Customers 1st Bank" will not become the legal name of New Century until August 2010. (Ehst, Tr. 06/17/10 at 167:3-7.) Despite the absence of requisite approval at a shareholder meeting, New Century has already made changes to the name on signs at existing branches by using cloth covers over the New Century name. (Id. at 167:8-16.) New Century has changed substantially all of its internal and external materials to reflect the new name and logo. (Id. at 201:12-202:10.) Permanent signs have not yet been installed, but have been ordered. New Century does not intend to install them until shareholders have approved the name change. (Id. at 167:17-21.) Although a complete name change has not been finalized at all branches, changing the name has already cost over $500,000. (Id. at 166:12-15; 167:3-17; 208:10-12.) Mr. Taylor testified that in order to reverse the changes already made, the cost would be at least another $500,000. A reversal would also affect New Century's integrity and reputation. (Taylor, Tr. 06/17/10 at 274:20-275:22.)

G.    Commonality of "Customer" and "First" in the Banking and Financial Industries

On May 14, 2010, Alliance commenced this action by filing a Verified Complaint. After receiving the Complaint, New Century requested counsel to commission a Trademark Dilution Search (the "Dilution Search") from Thomson Compumark in order to determine the use of the marks CUSTOMERS FIRST and CUSTOMERS 1ST BANK in the banking and financial industries. The purpose of the Dilution Search is to determine the number of companies using the terms, which may be evidence of how "diluted" the terms are in the industry. Mr. Taylor reviewed the Dilution Search on or about May 20, 2010. (Id. at 282:20-283:9; Def. Ex. 15.)

The Dilution Search revealed at least four (4) other institutions registered in Pennsylvania using the term "customer first" in their corporate name: "Customer First Financial Services LLC," "Customer First Mortgage, Inc.," "Customers 1st Mortgage, Inc." and "Exit Realty Customers First." (Def. Ex. 15.) One business, "Customer First Mortgage, Inc.," is located in Media, Pennsylvania, approximately three and eight-tenths (3.8) miles from Alliance's Springfield Branch, and approximately four and two-tenths (4.2) miles from Alliance's Lawrence Park Branch. (Def. Exs. 10, 15.) However, these organizations do not have their name registered with the USPTO, and no banking institution in Pennsylvania has registered "customer first" or any variation of that phrase with the USPTO. (Ehst, Tr. 06/17/10 at 221:15-18.)

At some point, Mr. Taylor conducted an internet search on Google, and found a bank named "Customer First Bank" in Plano, Texas. Mr. Taylor testified that this Texas bank owns the domain name www.customerfirstbank.com, but is not yet doing business. (Taylor, Tr. 06/17/10 at 241:3-10.) Mr. Taylor also testified that "with the exception of the Plano, Texas, bank that wasn't really a bank yet, I couldn't find another bank that had that name." (Id. at 303:16-18.) Further, during the period

16

Alliance has been using the mark CUSTOMER FIRST, there was no other use of the mark for banking services in Pennsylvania or neighboring states. (Cirucci, Tr. 06/17/10 at 9:15-10:17.)

## III. LEGAL STANDARD

### A. Jurisdiction

The Court has jurisdiction over the parties and subject matter of this case pursuant to 28 U.S.C. § 1338(a) (acts of Congress relating to trademarks), 15 U.S.C. § 1121 (actions arising under the Lanham Act), 15 U.S.C. § 1125(a) (cause of action for false designations of origin), 28 U.S.C. § 1338(b) (providing for federal jurisdiction over unfair competition claims when joined with a substantial and related claim under federal trademark laws), and 28 U.S.C. § 1367 (providing for supplemental jurisdiction over state law claims that are so related to federal law claims that they form part of the same case or controversy). Venue is proper under 28 U.S.C. § 1391(b) and (c).

### B. Preliminary Injunction

"[T]he grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). "A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." Acierno v. New Castle County, 40 F.3d 645, 647 (3d Cir. 1994). "[P]laintiffs must demonstrate that, regardless of their past harm, they are likely to suffer harm in the future." Sullivan v. DB Investments, Inc., ---F.3d ---, 2010 WL 2736947, *16 (3d Cir. July 13, 2010). In order to be granted a preliminary injunction, the moving party must establish its entitlement to a preliminary injunction by clear evidence on the merits of its claim. ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1986).

17

In determining whether to grant a motion for preliminary injunction, a court considers the following factors:

> (1) the likelihood that the moving party will succeed on the merits;
>
> (2) the extent to which the moving party will suffer irreparable harm without injunctive relief;
>
> (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and
>
> (4) the public interest.

McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting Shire U.S. Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003)). "[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court" should also look to factors three and four when relevant. Heritage Community Bank v. Heritage Bank, N.A., No. 08-4322, 2008 WL 5170190, *2 (D.N.J. Dec. 9, 2008) (quoting Acierno, 40 F.3d at 653). "All four factors should favor preliminary relief before the injunction will issue." S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 374 (3d Cir. 1992).

## IV.   CONCLUSIONS OF LAW

In Count One of the Verified Compliant, Plaintiff alleges trademark infringement by Defendant in violation of § 32(1) of the Lanham Act, which provides in relevant part:

> Any person who shall, without the consent of the registrant -
>
>> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

18

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

In Count Two of the Verified Complaint, Plaintiff alleges false designation of origin in violation of § 43(a) of the Lanham Act, which provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

One fundamental objective of trademark law is to prevent another from copying a source-identifying mark. Qualitex Co. v. Jacobson Prods., Co., Inc., 514 U.S. 159, 163-64 (1995); see also Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994) ("The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion.") (internal quotations omitted); 15 U.S.C. § 1055 ("If first use of a mark

19

by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.").[6]

## A.    Alliance is Likely to Succeed on the Merits of its Trademark Claim

To prove trademark infringement under the provisions of the Lanham Act quoted above, "a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).

### i.    Alliance Owns a Valid and Legally Protectable Service Mark[7]

Whether a mark is actually valid and legally protectable is tied to its distinctiveness. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). Trademark law recognizes four separate

---

[6]Under 15 U.S.C. § 1111, "a registrant of a mark registered in the [USPTO] may give notice that his mark is registered by displaying with the mark...the letter R enclosed within a circle, thus ®..." The designations TM and SM are also used for trademarks and service marks, and serve as informal notices to the public that a word, logo, slogan, design, etc. is being used as a mark and reflects the owner's intent to claim trademark rights in that mark.

[7]"A service mark is a word, name, symbol, device, or any combination thereof used 'to identify and distinguish the services of one person, including a unique service, from the services of others, and to indicate the source of the services.'" First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101 F.3d 645, 651 n.7 (10th Cir. 1996) (quoting the Lanham Act, 15 U.S.C. § 1127).

"Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods...Although technically distinct, the terms are often used interchangeably, with no significant legal consequences." Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 855 (3d Cir. 1992) (internal citation omitted); see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 192 n.1 (1985) (explaining that the same principles concerning registration and protection apply to trade and service marks).

categories of marks based on their level of inherent distinctiveness. From most distinctive to least distinctive, the four categories are:

> [1] arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods [or services]; [2] suggestive terms, which suggest rather than describe the characteristics of the goods [or services]; [3] descriptive terms, which describe a characteristic or ingredient of the article [or service] to which it refers[;] and [4] generic terms, which function as the common descriptive name of a product [or service] class.

E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 191 (3d Cir. 2008) (quoting A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir. 1986)); see also Two Pesos, 505 U.S. at 768. "Although these categories are often separated by only the finest of lines, 'the distinctions are crucial'" because:

> If we hold a term arbitrary or suggestive, we treat it as distinctive, and it automatically qualifies for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods. If we hold a mark descriptive, a claimant can still establish trademark rights, but only if it proves that consumers identify the term with the claimant, for that identification proves secondary meaning. . . .Finally, if we hold a designation generic, it is never protectable because even complete "success. . .in securing public identification. . .cannot deprive competing manufacturers of the product of the right to call an article by its name."

Dranoff-Perlstein, 967 F.2d at 855 (quoting Honickman, 808 F.2d at 297).

In other words, the Lanham Act protects "arbitrary or fanciful" terms, like "Kodak," because these terms are inherently distinctive. Suggestive terms, like "Coppertone," are protected "[i]f information about the product or service given by the term. . .is indirect or vague." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th Ed. 2010) § 11:19. Descriptive

terms, like "Security Center," however, are only protected if they have acquired secondary meaning.[8] A term is descriptive "if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods," Honickman, 808 F.2d at 297, thereby "directly giv[ing] some reasonably accurate or tolerably distinct knowledge of the characteristics of a product [or service]." 2 McCarthy § 11:19. A generic term, like "Diet Chocolate Fudge Soda," receives no trademark protection. Honickman, 808 F.2d at 308.

Indeed, "[t]he descriptive-suggestive borderline is hardly a clear one." McCarthy § 11:66. As the Seventh Circuit has explained, the distinction between suggestive and descriptive marks "is, undoubtedly, often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation." Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 379 (7th Cir. 1976), *superceded on other grounds by statute as stated in* Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423 (7th Cir. 1985).

The most popular test for determining whether a mark is descriptive or suggestive is the "imagination test." McCarthy § 11:67. The Third Circuit has described the "imagination test" as follows: "A term is suggestive if it requires imagination, thought or perception to reach a conclusion

---

[8] One commentator defines "secondary meaning" as: "When a particular business has used words publici juris for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained a secondary meaning. That is to say, a secondary meaning exists when in addition to their literal, dictionary meaning, words connote to the public a product *from a unique source*." McCarthy § 11:25 (internal citations omitted); see also Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) ("Secondary meaning exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services.'") (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978)). As noted above, suggestive marks, like arbitrary or fanciful marks, are "protected without any necessity for proving secondary meaning." McCarthy § 11:62.

as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." Honickman, 808 F.2d at 297 (internal quotation omitted). In other words, suggestive marks are those which "suggest rather than describe the characteristics of the goods" or services. Id. at 296. Courts also consider "whether sellers of similar products [or services] are likely to use, or actually do use, the term in connection with their goods." Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs., 750 F.2d 1295, 1299 (5th Cir. 1985); see Dranoff-Perlstein, 967 F.2d at 858 ("Frequent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive.").

In applying the "imagination test" described above, it appears that Alliance's mark CUSTOMER FIRST is at least "suggestive" and therefore inherently distinctive. The mark does not provide any direct information regarding Alliance's banking services, and the mark does not "forthwith convey" what service is at issue and to whom the service is directed. A consumer would not immediately connect CUSTOMER FIRST with community banking services. See McCarthy § 11:67 ("If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness.") Because the mark CUSTOMER FIRST requires imagination and thought to reach a conclusion as to the nature of the service provided, CUSTOMER FIRST is a suggestive mark.

Moreover, in general, registration of a mark on the Principal Register of the USPTO "constitutes prima facie evidence of the validity of the registered mark and. . .of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce on or in connection with the goods or services specified in the certificate [of registration]." Commerce Bancorp, Inc. v. BankAtlantic, 285 F.Supp.2d 475, 483-84 (D.N.J. 2003). If the mark has not

23

achieved incontestability[9], prima facie validity of the mark exists only if the registered mark is inherently distinctive or if proof of secondary meaning is established. Fisons, 30 F.3d at 472 (citing Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991)); see also Sav. Bank Life Ins. Co. of Mass. v. SBLI USA Mutual Life Ins. Co., Inc., No. 00-3255, 2000 WL 1758818, *15 (E.D. Pa. Nov. 29, 2000) ("SBLI") ("Because Plaintiff is the owner of a contestable federal registration of 'SBLI,' there is only a *rebuttable* presumption that it has exclusive rights to use the trademark throughout the United States. . .") (emphasis in original).

Importantly, several courts have found that if a plaintiff owns a registered mark, then it is entitled to a strong prima facie presumption that its registered mark is distinctive or it is descriptive and "secondary meaning is presumed." A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., 167 F.Supp.2d 770, 776 (E.D. Pa. 2001) (A & H II). In trademark cases, marks that are distinctive and marks that are descriptive with secondary meaning amount to the same thing. Id.; see also Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 117 (1st Cir. 2006) (when USPTO registers a mark without requiring secondary meaning, the mark is presumed to be inherently distinctive); Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999) ("Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive."); Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1534 (4th Cir. 1984) (explaining the significance of registration

---

[9]"A mark becomes incontestable after the owner files affidavits stating that the mark has been registered, and that it has been in continuous use for five consecutive years subsequent to registration. In addition, the owner must show that there is no proceeding contesting the owner's rights to registration, and that there has been no adverse decision regarding the registrant's ownership or right to registration." Commerce Bankcorp., 285 F.Supp.2d at 484 n. 5 (citing Fisons, 30 F.3d at 472 n. 7). Alliance does not contend here that the mark is incontestable.

without proof of secondary meaning); Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc., 687 F.2d 563, 567 (2d Cir. 1982) (finding that registration indicates that "the mark is not merely descriptive and gives to it a strong presumption of validity").

Here, even though Alliance's mark is contestable, the registered mark CUSTOMER FIRST is entitled to a prima facie presumption that the mark is valid and protectable. As described above, Alliance has continuously used CUSTOMER FIRST since 2006 to identify its banking services and to identify one of its products, "Customer First Checking." On October 16, 2007, the mark was registered in the USPTO on the Principal Register as Certificate of Registration No. 3,313,156. (Verified Compl. at ¶¶ 11-13.) Moreover, Alliance is entitled to a prima facie presumption that its registered mark is distinctive or descriptive with secondary meaning. Alliance never received a rejection from the USPTO for lack of distinctiveness of CUSTOMER FIRST, and Alliance was never required to prove secondary meaning to obtain Registration No. 3,313,156.

To rebut the presumption of validity, New Century set forth a number of arguments as to why Alliance's mark should be cancelled: (1) Alliance fraudulently obtained the mark; (2) extensive third-party usage of the words "customer" and "first" in the business and financial industries shows that CUSTOMER FIRST is merely a descriptive term that lacks secondary meaning; (3) the registered mark has not been used in commerce in connection with goods or services (doctrine of non-use); (4) the mark applied for does not match the mark as it is actually used in commerce (doctrine of mutilation); and (5) the mark has been discontinued with no intent to resume (doctrine of abandonment). None of these arguments persuade the Court that the registration of the mark CUSTOMER FIRST by Alliance should be declared invalid.

a.    Alliance Did Not Fraudulently Obtain the Mark

First, New Century argues that the registration of CUSTOMER FIRST with the USPTO should be cancelled because Alliance fraudulently obtained the mark. In its Response in Opposition to the Motion for Preliminary Injunction (Doc. No. 16, at 8) New Century contended that in the application for the mark CUSTOMER FIRST, Alliance's counsel represented that the mark was being used in connection with numerous services for which it was not actually being used, and the USPTO relied on such misrepresentations in issuing the registration. (Pl. Ex. 10; Cirucci, Tr. 06/17/10 at 138:12-139:25.) At the hearings held on June 17 and 18, 2010, and at the oral argument held on June 29, 2010, New Century refined its contention by arguing that Alliance was not providing, nor has it ever provided, "investment banking" or "mortgage" services in connection with the mark CUSTOMER FIRST. (Id. at 58:5-59:17.) Consequently, New Century asserts that since the USPTO relied on Alliance's false statements regarding use, Registration No. 3,313,156 must be cancelled. The Court is not persuaded by New Century's argument.

In conjunction with its trademark application, Alliance submitted the following Statement of Use explaining that Alliance was using CUSTOMER FIRST for "Services customary in the banking industry, namely, banking, banking consultation, investment banking services, mortgage and personal banking services, namely, origination, acquisition servicing, securitization, and brokerage of commercial and personal mortgage loans and online banking services." (Pl. Ex. 10.)

As explained in the findings of fact, *supra*, Alliance is using the mark CUSTOMER FIRST in conjunction with many of the services offered by the bank. As Mr. Cirucci explained, the CUSTOMER FIRST mark is most prominently featured on one checking account offered to Alliance's customers; however, that checking account "serves as the hub for all of [their] other

26

related products. And it sort of acts as a bridge and brings them together." (Cirucci, Tr. 06/17/10 at 9:2-7.) For example, products such as safety deposit boxes, home equity loans, and mortgage loans are tied to a consumer's Customer First Checking Account. If a customer rents a safety deposit box, the yearly fee would be paid from the Customer First Checking Account. The manner and means of use of the mark in conjunction with its products is fully set forth above in section II(C)(i).

New Century's interpretation of the words contained in the Statement of Use is simply too confining. A registrant is afforded a certain amount of discretion in use of its mark. A registrant is permitted to use the mark as it sees fit within the overall descriptions so long as its use furthers an appropriate business purpose. The Statement of Use in the application merely puts the USPTO on notice of the generic categories in which the mark is used.

Additionally, Alliance advertised the slogan "Customer First Banking Just Hit Home" on various bus shelters throughout the Delaware Valley in 2006. Alliance employees even wore lapel pins that stated CUSTOMER FIRST. These are customary, permissible uses of a mark. They are not specifically listed in the Statement of Use, but they refer to all banking services offered by Alliance. Accordingly, the Court is not convinced that Alliance did not use the mark CUSTOMER FIRST for various banking services performed by the bank when the Statement of Use was filed.

Furthermore, New Century's argument that Alliance committed fraud, made intentional false statements, and engaged in inequitable conduct in obtaining the mark also fails. Recently, the Federal Circuit discussed the doctrine of inequitable conduct in trademark cases:

> "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application." Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 48 (Fed. Cir. 1986). A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy

27

> burden of proof. W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.,
> 54 C.C.P.A. 1442, 377 F.2d 1001, 1004 (1967). Indeed, "the very
> nature of the charge of fraud requires that it be proven 'to the hilt'
> with clear and convincing evidence. There is no room for
> speculation, inference or surmise and, obviously, any doubt must be
> resolved against the charging party." Smith Int'l, Inc. v. Olin Corp.,
> 209 USPQ 1033, 1044 (T.T.A.B. 1981).

In re: Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009).

In that case, the court explained that "[m]ere negligence is not sufficient to infer fraud or dishonesty." Id. at 1245 (quoting Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1582 (Fed. Cir. 1991)). The court concluded, "[t]hus, we hold that a trademark is obtained fraudulently under the Lanham Act only if the applicant or registrant knowingly makes a false, material misrepresentation with the intent to deceive the PTO." Id.

In this case, it is clear that New Century has failed to meet its "heavy burden of proof" required to prove fraud. A central element of fraud is an intent to defraud. Marshak v. Treadwell, 58 F.Supp.2d 551, 566 (D.N.J. 1999) ("[F]raud requires proof of a willful intent to deceive."). New Century has failed to demonstrate any intent on Alliance's part to deceive or to knowingly make a false material statement to the USPTO. In this regard, the Court finds that Mr. Cirucci provided truthful testimony about the use of the mark at the time registration was sought and had no intent to deceive the USPTO. Through the use of the Customer First Checking Account and its other uses of the mark CUSTOMER FIRST, Alliance has shown that it is using the mark CUSTOMER FIRST as part of its overall banking services. Consequently, New Century's argument that Alliance's mark must be cancelled because it was fraudulently obtained must fail.

28

b.    Third Party Usage

Next, New Century argues that the mark CUSTOMER FIRST is weak and descriptive and that Alliance has failed to offer proof of secondary meaning. New Century contends that the terms "customer" and "first" are ubiquitous in banking and financial industries. New Century also maintains that the mark cannot be considered inherently distinctive because of extensive third party use of the term.

Third party registrations are relevant to prove that the marks both parties are using have a commonly understood and well-recognized meaning, leading to the conclusion that the mark is relatively weak. McCarthy § 85. The Third Circuit has noted that "[f]requent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive." Dranoff-Perlstein, 967 F.2d at 858; see also Citizens Fin. Group, Inc. v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 123 (3d Cir. 2004) (finding that "as a general rule, widespread use of even a distinctive mark may weaken the mark"); First Sav. Bank, 101 F.3d at 654 (recognizing "the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection").

New Century has submitted the following evidence in support of its contention of widespread use of CUSTOMER FIRST: (1) printouts of a list from the USPTO's Trademark Electronic Search System of live applications and registrations in International Class 36 containing the term CUSTOMER or the term FIRST; (2) printouts from twelve (12) third party websites purporting to show trademark use of the term CUSTOMER FIRST; and (3) the Dilution Search conducted on May 19, 2010, which shows listings of federal and state registrations of CUSTOMER FIRST marks. (Def

29

Exs. 5, 6, 15.)[10]  Based on these items, New Century argues that the mark CUSTOMER FIRST is

invalid and subject to cancellation because the mark is merely descriptive and Alliance has failed

to show secondary meaning.

The Court finds New Century's argument unpersuasive. While evidence of third party use

of similar marks on similar goods may be relevant to show that a mark is relatively weak, courts and

commentators have recognized that the significance and evidentiary impact of third party marks turns

entirely upon their <u>usage</u> (not likely usage) and the impact that such use has had on the minds of

consumers. See <u>Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)</u>, 544 F.2d 1167, 1173 (2d Cir.

---

[10]On June 15, 2010, Alliance filed a Motion in Limine to Preclude New Century from
offering or presenting testimony or evidence relating to the May 19, 2010, Dilution Search
Report (Doc. No. 23).  The Dilution Search Report was commissioned by New Century's counsel
to demonstrate third party use of the mark CUSTOMER FIRST in connection with the present
Motion for Preliminary Injunction.  On June 16, 2010, New Century filed a Response in
Opposition to the Motion in Limine (Doc. No. 25).  The Court heard argument on the Motion at
several points during the June 17 and June 18, 2010, hearing, as well as at the June 29, 2010, oral
argument.  The Court held the Motion under advisement until the issuance of this Opinion.  For
the following reasons, Plaintiff Alliance's Motion in Limine (Doc. No. 23) will be denied.

Alliance's main argument to preclude admission of the May 19 Report is that it is
hearsay.  However, Alliance's argument is unavailing in light of <u>Kos Pharm., Inc. v. Andrx
Corp.</u>, 369 F.3d 700 (3d Cir. 2004).  In <u>Kos</u>, the Third Circuit explained that "[i]t is well
established that 'a preliminary injunction is customarily granted on the basis of procedures that
are less formal and evidence that is less complete than in a trial on the merits.'" 369 F.3d at 718
(quoting <u>Univ. of Texas v. Camenisch</u>, 451 U.S. 390, 395 (1981)).  The court further explained
that "many of our sister Circuits have recognized that '[a]ffidavits and other hearsay materials are
often received in preliminary injunction proceedings.'" <u>Kos</u>, 369 F.3d at 718; <u>see also Heritage
Community Bank</u>, 2008 WL 5170190, at *9 n. 7 (citing cases).  Therefore, the Court will
consider the Dilution Search Report for the purposes of deciding the Motion for Preliminary
Injunction.

Alliance's remaining argument regarding the probative value of the Dilution Search
Report merely goes to the weight of the evidence, not to its admissibility.  Consequently, the
Court will not preclude this evidence and will give the evidence such weight as deemed
appropriate in considering the parties' claims.

1976) ("The significance of third-party trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers. . .[T]he existence of [third party] registrations is not evidence of what happens in the market place or that customers are familiar with their use."); Olde Tyme Foods, Inc. v. Roundy's, Inc., 961 F.2d 200, 203-04 (Fed. Cir. 1992) (third party registrations "may not be given *any* weight" as to the strength of a mark) (emphasis in original); McCarthy § 11:88 (noting that "merely introducing a list of third party uses alone is not particularly persuasive. To present a more compelling case, defendant should go further to show how extensive these uses are and how long they have continued.").

Here, New Century has failed to show that third party use of the mark CUSTOMER FIRST in the banking industry is so widespread that Alliance's mark should be deemed weak and descriptive. New Century has submitted evidence that there are at least four (4) other financial services firms using the term "customer first" in their corporate name registered in Pennsylvania. None, however, provide banking services. Moreover, no evidence is offered as to how these third party registrations are used and how they are perceived by consumers. New Century did introduce evidence of Mr. Taylor's internet search where he found a bank named "Customer First Bank" in Plano, Texas. This bank owns the domain name www.customerfirstbank.com, but it is merely a bank that has not yet started to operate. (Taylor, Tr. 06/17/10 at 241:3-10.) Mr. Taylor testified that "with the exception of the Plano, Texas, bank that wasn't really a bank yet, I couldn't find another bank that had that name." (Id. at 303:16-18.) Consequently, merely listing the number of third party registrations without showing the extent of individual use or consumer perception is not particularly persuasive. For this reason, New Century's argument that Alliance's mark cannot be considered

31

inherently distinctive because of extensive third party use of the terms fails.

> c. The Doctrines of Non-Use, Mutilation, and
> Abandonment are Inapplicable

New Century argues that Alliance's mark CUSTOMER FIRST is invalid and subject to cancellation because the mark has never been used in commerce in connection with "investment banking" or "mortgage services." See 15 U.S.C. § 1127 (defining "commerce"); McCarthy § 17:9 ("It is actual usage of a symbol as a 'trademark' in the sale of goods which creates and builds up rights in a mark.").

It is undisputed that Alliance offers a product named "Customer First Checking Account" and does not offer products named, for example, "Customer First Investment Banking" or "Customer First Mortgage Services." However, as explained above in regard to the claim of fraud, the Court is persuaded that Alliance is using the mark CUSTOMER FIRST for many of the services offered by the bank. As Mr. Cirucci explained, the CUSTOMER FIRST mark is most prominently featured on one checking account offered to Alliance's customers; however, that checking account "serves as the hub for all of [their] other related products. And it sort of acts as a bridge and brings them together." (Cirucci, Tr. 06/17/10 at 9:2-7.) Products such as safety deposit boxes, home equity loans, and mortgage loans are tied to a consumer's Customer First Checking Account, see section II(C)(i). Consequently, New Century's argument that Alliance's mark must be cancelled for non-use must fail.

Next, New Century argues that Alliance's mark is subject to cancellation because the mark comprises a mutilation of the mark as used in commerce. New Century argues that the only mark used in commerce is "Customer First Checking," even though Alliance applied for and registered

the mark CUSTOMER FIRST for several other uses. For the reasons noted already, the Court is persuaded that Alliance is using the mark CUSTOMER FIRST for many services offered by the bank. Accordingly, New Century's mutilation argument is not persuasive.

Finally, New Century argues that Alliance's mark must be cancelled because the mark CUSTOMER FIRST has been abandoned by Alliance. In particular, New Century contends that the only way that Alliance has used the mark independent of the Customer First Checking Account is in connection with a lapel pin that its employees stopped wearing thirty (30) months ago. New Century further argues that Alliance has shown no intent to resume use of the mark apart from the name of the checking account since that time. Clearly, in light of the Court's findings discussed above, New Century's argument fails. Alliance has presented substantial evidence pertaining to its use of the mark CUSTOMER FIRST and its intent to continue to use the mark for many services associated with the bank.[11]

---

[11]On July 2, 2010, Alliance filed a Response to New Century's Proposed Conclusions of Law (Doc. No. 34). Although the Court had instructed the parties not to file responses to the proposed Findings of Fact and Conclusions of Law, Alliance argues that it was compelled to file a response after New Century allegedly failed to follow the Court's directive that New Century's proposed Conclusions of Law should be tailored specifically to New Century's proposed Findings of Fact and should not contain rebuttal to the Findings of Fact and Conclusions of Law filed by Alliance. On July 7, 2010, New Century filed a Motion to Strike Alliance's Response to the Proposed Conclusions of Law because Alliance did not seek leave of Court to present additional legal argument (Doc. No. 35). On July 12, 2010, Alliance filed a Response in Opposition to the Motion to Strike (Doc. No. 37). Finally, on July 14, 2010, New Century filed a Reply in support of the Motion to Strike (Doc. No. 38).

After a review of these filings, the Court concludes that Alliance's Response to New Century's Conclusions of Law (Doc. No. 34) did not contain new legal argument or any discussion of substance that had not been covered extensively in the parties' pleadings, the preliminary injunction hearing held on June 17 and 18, 2010, the oral argument held on June 29, 2010, and Alliance's proposed Findings of Fact and Conclusions of Law. Consequently, Alliance's submission did not prejudice New Century, and it will not be stricken from the record. Accordingly, New Century's Motion to Strike (Doc. No. 35) will be denied.

33

In sum, New Century's position ignores the tenet that while "[a] mark might be weak in the national market, [it] might still be strong in the senior user's geographical and product area and thus deserving of protection." CNB Fin. Corp. v. CNB Community Bank (IO), No. 03-6945, 2004 WL 2434878, *10 (E.D. Pa. Sept. 30, 2004) (quoting Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 967 (6th Cir. 1987)). For all these reasons, Alliance has proven that it owns a valid and legally protectable mark. The Court will now turn to the final prong of the "likelihood of success on the merits" test applicable to a Lanham Act trademark action.

> ii.     New Century's Use of the Name Customers 1st Bank
>         Creates a Likelihood of Confusion

"A likelihood of confusion exists when 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" A & H, 237 F.3d at 211 (quoting Dranoff-Perlstein, 967 F.2d at 862).[12] "Proof of actual confusion is not necessary; likelihood is all that need be shown." Ford Motor Co., 930 F.2d at 292 (quoting Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990)). "Absent a likelihood of confusion, therefore, no cause exists to enjoin the non-registrant's use of the mark." Members First Fed. Credit Union v. Members 1st Fed. Credit Union, 54 F.Supp.2d 393, 400 (M.D. Pa. 1999).

In determining whether likelihood of confusion exists, the Third Circuit requires district courts to consider the following factors, which are referred to as the Lapp factors:

---

[12]The Supreme Court long ago discussed the amorphous test for confusion in McLean v. Fleming, 96 U.S. 245, 251 (1878): "What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases. All that courts of justice can do, in that regard, is to say that no trader can adopt a trade-mark, so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled."

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; [and]

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

A & H, 237 F.3d at 215 (citing Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983));

Sabinsa Corp. v. Creative Compounds, LLC, No. 08-3255, --- F.3d ---, 2010 WL 2705162, *4 (3d Cir. July 9, 2010). These Lapp factors can be applied to both competing and noncompeting goods.[13]

---

[13]The court in Lapp explained that "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." 721 F.2d at 462 (internal citations omitted). However, the Third Circuit explained in A & H that "consideration of the Lapp factors. . .can be quite useful for determining likelihood of confusion even when the goods compete directly." 237 F.3d at 212. Thus, even though the parties deal in competing services, the Court will address the Lapp factors to determine likelihood of confusion.

Id. at 213. In A & H, the Third Circuit noted that "the Lapp test is a qualitative inquiry. Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation." Id. at 215; see also First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc., 923 F.Supp. 693, 704 (E.D. Pa. 1996) ("A party need not show every factor to succeed on an infringement claim, nor does every factor weigh the same amount."); Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 280 (3d Cir. 2001) ("None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."). The Court now will turn to these Lapp factors.

a.    Factor 1: Similarity of the Marks

"The single most important factor in determining likelihood of confusion is mark similarity." A & H, 237 F.3d at 216. "The marks need not be identical, only confusingly similar." Fisons, 30 F.3d at 477 (quoting Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., 963 F.2d 628, 636 (3d Cir. 1992)). "Where the goods. . .are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." Kos, 369 F.3d at 713 (quotation omitted).

The test for determining the similarity of the marks is "whether the labels create the same overall impression when viewed separately." A & H, 237 F.3d at 216 (internal citations omitted); see Ford Motor Co., 930 F.2d at 293 ("[I]f the overall impression created by the marks is essentially the same, 'it is very probable that the marks are confusingly similar.'") (internal quotations omitted); Kos, 369 F.3d at 713 ("The proper test is 'not side-by-side comparison' but 'whether the labels create the same overall impression when viewed separately.'") (quoting Fisons, 30 F.3d at 477);

36

Sabinsa, 2010 WL 2705162, at *4 ("Marks are confusingly similar 'if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship.'") (quoting Fisons, 30 F.3d at 477). Courts must "compare the appearance, sound and meaning of the marks" in assessing similarity. Checkpoint, 269 F.3d at 281 (quotation omitted).

When comparing two marks each must be viewed in its entirety, although "one feature of a mark may be more significant than other features, and. . .it is proper to give greater force and effect to that dominant feature." Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570 (Fed. Cir. 1983). "When the dominant portions of the two marks are the same, confusion is likely." Country Floors, Inc. v. A Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1065 (3d Cir. 1991); see also Sabinsa, 2010 WL 2705162, at **4-5 (finding an overall impression of similarity between the marks "ForsLean" and "Forsthin").

Here, New Century has adopted and used the mark CUSTOMERS 1ST BANK that is substantially identical in sound and commercial meaning to Alliance's mark CUSTOMER FIRST. Most obvious is the striking similarity of the sound of the marks. The "dominant feature" of both marks is a variation of "customer first." Moreover, the addition of "S" to CUSTOMER and the generic term BANK do not avoid a finding of confusing similarity. See Fisons, 30 F.3d at 477 ("[A] subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-descriptive matter to it."); Heritage Community Bank, 2008 WL 5170190, at *4 (granting preliminary injunction and finding Heritage Bank, N.A. to be confusingly similar to Heritage Community Bank); CNB Fin. Corp., 2004 WL 2434878, at *9 (granting preliminary

injection because "CNB Community Bank" is confusingly similar to "CNB").[14]

Importantly, even though the words "First" and "1st" look different, the two words are pronounced exactly the same way. See In re: 1st USA Realty Prof'ls, Inc., 84 USPQ2d 1581, 1586 (T.T.A.B. 2007) (holding that the mark 1st USA and its design for real estate brokerage and listing services are likely to cause confusion with First USA); Acxiom Corp. v. Axiom, Inc., 27 F.Supp.2d 478, 495-96 (D. Del. 1998) ("[T]rademarks, like small children, are not only seen but heard.") (internal quotation omitted). Moreover, the CUSTOMERS 1ST BANK logo does not appear in that form in one of New Century's internet domain names (e.g., www.customersfirst.com) and in connection with employee email addresses (e.g., joesmith@customersfirst.com). This is evidence not only of an intent to use a strikingly similar mark to CUSTOMER FIRST, but also evidence of the aural resemblance of "First" and "1st." The distinguishing features of an "S" at the end of "customer" and the addition of the word "Bank" do not dispel the overall similarity of the marks and likelihood of confusion.

As to appearance, New Century employs a red and black color scheme, and the bank's logo features a red ball encompassing the word "1st." In contrast, Alliance employs a blue and yellow color scheme (when advertising in color), and the logo is written in ordinary font. In addition, New Century argues that Alliance's frequent use of its housemark ALLIANCE BANK along with the mark CUSTOMER FIRST in its advertising avoids any possibility of confusion between Alliance's mark and New Century's mark CUSTOMERS 1ST BANK. The Third Circuit in A & H stated that

---

[14]The Court is also persuaded that consumers often drop the word "bank" when referring to a financial institution, e.g., referring to PNC Bank as simply "PNC" or Wachovia Bank as simply "Wachovia." See, e.g., Heritage Community Bank, 2008 WL 5170190, at *4 (noting that it is common in business practice for commercial bank names to be shortened to its dominant portion, such as "Chase" for J.P. Morgan Chase & Co. or "WaMu" for Washington Mutual).

"affixing a well-known housemark. . .can help diminish the likelihood of confusion." 237 F.3d at 218.

The disparities argued by New Century are trumped, however, by the similarity in sound between the two marks. See Palantir Techs. Inc. v. Palantir.net, Inc., 85 USPQ2d 1764, 1768 (N.D. Cal. 2008) ("The marks are identical. They sound the same and have the same meaning. While the fonts used by the companies are different, this distinction is meaningless, especially since these companies are essentially marketing services, not mass production goods."); Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc., 669 F.Supp. 1297, 1320 (E.D. Pa. 1987) ("When the dominant portions of two marks sound the same when spoken by consumers, there is likely to be confusion. Any differences in the design of the marks does not dispel this confusion."); CNB Fin. Corp., 2004 WL 2434878, at *9 ("The fact that the parties' marks are different colors and CNB (IO)'s logo contains a leaf-overlay does not diminish the similarity of the competing marks and the potential for confusion.").

Finally, Alliance and New Century offer competing services as community banks in the same region. For this reason, the degree of similarity required to prove likelihood of confusion is less than in a case of dissimilar products. Analytic Recruiting, Inc. v. Analytic Res., LLC, 156 F.Supp.2d 499, 515 (E.D. Pa. 2001) (where both parties offered competing services, and relied heavily on electronic media and word of mouth advertising, court found it "even more likely that confusion will arise"). In sum, when viewed and heard separately, the overall impression of the two marks is essentially the same, which is a primary factor to consider when determining whether there is a likelihood of

confusion. Accordingly, the first <u>Lapp</u> factor weighs overwhelmingly in favor of Alliance.[15]

      b.      Factor 2: <u>Strength of the Mark</u>

"To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." <u>Sabinsa</u>, 2010 WL 2705162, at *5; <u>see also</u> <u>Fisons</u>, 30 F.3d at 479 ("Distinctiveness on the scale of trademarks is one measure of a mark's strength. . .Commercial strength, or marketplace recognition of the mark, is another.").

---

[15]As noted above, on April 20, 2010, the USPTO refused each of New Century's five applications to register variants of the mark CUSTOMERS 1ST BANK on the basis that the marks depicted in the applications so resemble Alliance's mark CUSTOMER FIRST (Registration No. 3,313,156) as to be likely to cause confusion or mistake or to deceive under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d). The Third Circuit has expressed on numerous occasions that the determination of the USPTO regarding trademark registrability is relevant but need not be given much weight when considering likelihood of confusion. <u>See</u> <u>A & H</u>, 237 F.3d at 220-21 ("[A]lthough an initial [US]PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court."); <u>Kos</u>, 369 F.3d at 715 (finding that the court would give "no weight" to a "low-level preliminary decision").

The USPTO applies Section 2(d) of the Lanham Act to determine whether a mark which is the subject of an application for registration is likely to cause confusion with a previously used or registered mark. As discussed at oral argument, in making this determination, the USPTO uses a thirteen-factor test set forth in <u>In re: E.I. DuPont de Nemours & Co.</u>, 476 F.2d 1357, 1361 (C.C.P.A. 1973). It appears that the thirteen-factor <u>DuPont</u> test is similar to the ten-factor <u>Lapp</u> test applied by the courts in the Third Circuit.

It also appears that the USPTO's determination was not a "low-level preliminary decision" because the analysis of the trademark examining attorney was thorough and resulted in a response by New Century. (Pl. Exs. 8, 30, 31.) It is unclear, however, to what extent the trademark examining attorney had access to the plethora of evidence presented in this case. Consequently, the Court finds the examining attorney's determination relevant, but entitled to little weight. However, the Court will give weight to the existence of the USPTO's determination and New Century's awareness of the determination when considering the fifth <u>Lapp</u> factor, the intent of Defendant, discussed *infra*.

In regard to the first feature or distinctiveness of CUSTOMER FIRST, the Court has already found that Alliance's mark is suggestive and is entitled to trademark protection, see section IV(A) (i). The Court will now consider the second feature or commercial strength and marketplace recognition of CUSTOMER FIRST to determine the strength of the mark and how this Lapp factor weighs in the likelihood of confusion analysis.

In this case, Alliance, the purported "senior" user of the mark, is also the smaller user because New Century is a larger bank. Both banks operate as community banks. However, it appears that New Century operates with more capital, more accounts, and serves a greater number of consumers. Consequently, this case implicates the doctrine of "reverse confusion," which is pertinent to trademark litigation. In Fisons, supra, the Third Circuit adopted the doctrine of "reverse confusion" and explained:

> Ordinarily, one expects that the new or junior user of the mark will use to its advantage the reputation and good will of the senior user by adopting a similar or identical mark. Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services. . . .

> In reverse confusion, the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark - its product identity, corporate identity, control over its goodwill and reputation and ability to move into new markets. . . .

> Without the recognition of reverse confusion, smaller senior users would have little protection against larger, more powerful companies who want to use identical or confusingly similar trademarks.

Fisons, 30 F.3d at 474-75 (citing cases). When applying the strength of mark factor in a reverse

confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." Commerce Nat'l Ins. Servs., 214 F.3d at 444.

In this case, even though New Century is the larger and junior user of the disputed mark, Alliance has furnished sufficient evidence of the marketplace strength and recognition of its own mark. Indeed, Alliance has used CUSTOMER FIRST to identify one of its checking products that is used in association with other banking services and the mark serves as a hub for Alliance's other related banking products and services. Alliance also advertises this service on its handouts to the public and in other ways noted above.

Since 2006, Alliance's advertising of CUSTOMER FIRST has been significant. Over the past four (4) years, Alliance has placed advertisements promoting CUSTOMER FIRST banking services on large posters in various bus shelters throughout the Delaware Valley and through direct mailings. Alliance regularly advertises its mark in local newspapers, including the Philadelphia Inquirer and Daily Local. Alliance also maintains a website, on which it distributes news and information about banking services and products and the mark CUSTOMER FIRST is prominently displayed. Finally, over the years Alliance has used the mark in connection with banking services and the checking account, in and around its branches and operations, and in various brochures, signage, television screen shots and promotional items, such as the lapel pins worn by Alliance employees who interacted with the public.

In total, Alliance has spent more than $500,000 in advertising and marketing CUSTOMER FIRST. See A & H, 237 F.3d at 224 (advertising expenditures are "clearly relevant" to a commercial strength inquiry). Notably, the geographic area in which Alliance operates is relatively small,

42

encompassing areas in and around Chester and Delaware Counties, which overlaps with the area in which New Century does business. That Alliance has spent a considerable amount of money in a concentrated geographic area is probative evidence of the commercial strength and marketplace recognition of its mark. For all these reasons, the Court finds that CUSTOMER FIRST is a strong mark and this factor weighs in favor of Alliance.

### c. Factor 3: Care and Attention Expected of Consumers

In McNeil, the Third Circuit discussed the third Lapp factor, consideration of the sophistication of consumers. Quoting Versa Prods., Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 204-05 (3d Cir. 1995), the Third Circuit explained:

> The following non-exhaustive considerations should guide a court's determination of the standard of ordinary care for a particular product. Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of a product, the more care that must be exercised in its selection. In addition, the degree of caution used depends on the relevant buying class. That is, some buyer classes, for example, professional buyers will be held to a higher standard of care than others. *Where the buyer class consists of both professional buyers and consumers, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class.*

McNeil, 511 F.3d at 363-64 (emphasis added); see also Sabinsa, 2010 WL 2705162, at *6 ("[W]here the group of buyers is a combination of professionals and ordinary consumers, the class as a whole is not held to the higher standard of care.").[16]

---

[16]In Citizens Banking Corp., the district court found persuasive the testimony of an expert witness regarding the sophistication of commercial banking customers. In that case, the court found that most banking consumers do not change banks frequently and when they do select a new bank, consumers "take great care in evaluating a bank and its services." Citizens Banking Corp. v. Citizens Fin. Group, Inc., No. 07-11514, 2008 WL 1995104, *11 (E.D. Mich. May 6, 2008). Similarly, in SBLI, the district court found that, "Particularly in the financial services area, where consumers take greater care than in many others, such differences are sufficient to

Here, New Century contends that a consumer of banking services exercises a great deal of care when making a financial and investment decision and such consumers are "sophisticated." For this reason, New Century argues that confusion is unlikely in this case. This conclusion, however, is not supported by the evidence because the Court finds persuasive the testimony of Mr. Cirucci regarding the diversity of customers of community banks like Alliance and New Century. (Cirucci, Tr. 06/17/10 at 141:22-143:20.) Mr. Cirucci testified that customers are a mixed buyer class, consisting of individuals and businesses residing in Delaware and Chester Counties, as well as individuals residing in Bucks County, Pennsylvania. (Id. at 28:14-16; 43:19-22.) Businesses, both small and large, non-profit entities, municipalities, governmental units, families, seniors and retirees are customers of Alliance. (Id. at 43:17-44:3.)

Under the McNeil test, "[c]onsumers of both banks, therefore, would be expected to exercise the care of a routine banking customer in making decisions about banking services, which is more limited than what might be expected of sophisticated banking customers or financial service professionals." Heritage Community Bank, 2008 WL 5170190, at *7. Since customers for community banking services are the target of both parties in overlapping geographic areas, there is potential for confusion in the future. This factor weighs in favor of Alliance, albeit not as much as Factors (1) and (2), *supra*.

reduce any confusion." 2000 WL 1758818, at *18. This Court, however, is persuaded by Mr. Cirucci's testimony that community bank customers consist of professional buyers and ordinary consumers. (Cirucci, Tr. 06/17/10 at 141:22-143:20.) Consequently, this Court will apply the standard of care equal to that of the least sophisticated consumer in the class, as directed by the Third Circuit in McNeil, Versa Prods., and Sabinsa.

d.    Factor 4:  Length of Time Defendant Has Used the Mark

Alliance began using the mark CUSTOMER FIRST in March 2006 and on October 16, 2007, the mark was approved and registered with the USPTO on the Principal Register.  In contrast, New Century announced that it had changed its name to Customers 1st Bank on April 26, 2010.  (Pl. Ex. 14.)  In the few months that New Century has used the name Customers 1st Bank, there has been no evidence of consumer confusion as to the source of the banking products.  (Cirucci, Tr. 06/17/10 at 52:23-53:1; 146:13-148:4.)  However, New Century has not yet replaced all of its old signs with Customers 1st Bank signs, and it does not plan to replace the old signs until the shareholders approve the name change.  (Ehst, Tr. 06/17/10 at 167:8-21.)  Accordingly, the Court finds that there has been an insufficient amount of time during which both marks were used to be able to apply this factor and infer that customers will or will not be confused by the marks.  See Kos, 369 F.3d at 717 ("Per the fourth Lapp factor, two parties' concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future customers will not be confused either.'") (quoting Fisons, 30 F.3d at 476).  Consequently, this factor is given minimal weight and does not weigh in favor of or against a finding of likelihood of confusion.

e.    Factor 5:  Intent of Defendant[17]

_____

[17]On June 10, 2010, Alliance filed a Motion to Preclude New Century from offering testimony or evidence relating to New Century's adopting or using the mark CUSTOMERS 1ST BANK (or CUSTOMERS FIRST BANK) in good faith (Doc. No. 20).  On June 16, 2010, New Century filed a Response in Opposition to this Motion to Preclude (Doc. No. 24).  The Court heard argument on the Motion at several points at the June 17 and 18, 2010, hearing, as well as at the June 29, 2010, oral argument.  The Court took the Motion under advisement until the issuance of this Opinion.  For the following reasons, Alliance's Motion to Preclude (Doc. No. 20) will be denied.

45

"[E]vidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing mark[]' weighs strongly in favor of finding [a] likelihood of confusion." Checkpoint, 269 F.3d at 286 (quotation omitted). However, intent of defendant is not a prerequisite to a finding of likelihood of confusion. Sabinsa, 2010 WL 2705162, at *8. As the Court of Appeals for the Second Circuit has observed, "intent is largely irrelevant in determining if consumers likely will be confused as to source. The history of advertising suggests that consumer reactions usually are unrelated to manufacturer intentions." Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986).

In Fisons, the Third Circuit remanded the case to the district court to determine whether defendant "conducted an adequate name search for other companies marketing similar goods under trademarks including the name 'Fairway,' and whether it followed through with its investigation

---

As noted above, New Century maintains that it sought the opinion of counsel in March 2010 as evidence of good faith on New Century's part. This evidence is relevant to the fifth Lapp factor concerning intent of Defendant. New Century, however, has invoked the attorney-client and work product privileges and has not produced the formal opinion of counsel. Alliance argues that New Century should be precluded from offering evidence of this good faith because counsel's opinion is unknown and it is unknown if New Century followed counsel's advice.

Although New Century has not produced the opinion of counsel here, no bad faith inference will be drawn from such a strategy. See Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 318 (3d Cir. 1999) (finding that no adverse inference could be drawn from defendant's refusal to produce the opinion of counsel in a trademark dilution case). The cases Alliance offers in support of its position concern factual disputes arising either at trial or on the eve of trial, and involve matters such as willful infringement and damages. See, e.g., Dorr-Oliver Inc. v. Fluid-Quip, Inc., 834 F.Supp. 1008 (N.D. Ill. 1993) (Motion for Summary Judgment stage); Trouble v. Wet Seal, Inc., 179 F.Supp.2d 291 (S.D.N.Y. 2001) (Motion in Limine prior to commencement of trial). These cases are not persuasive authority here. Because this case is merely at the preliminary injunction stage, the Court will consider New Century's testimony pertaining to the good faith adoption of CUSTOMERS 1ST BANK and will weigh this evidence in light of the fact that the substance of the opinion of counsel is unknown to the Court. Consequently, Plaintiff's Motion to Preclude (Doc. No. 24) will be denied.

when it found there were such companies." Fisons, 30 F.3d at 480. In so doing, the court noted that in certain cases, a defendant "may have acted innocently, [but] was careless in not conducting a thorough name search for American uses of the name." Id. (quoting Lapp, 721 F.2d at 463). See also Commerce Nat'l Ins. Servs., 214 F.3d at 444 (explaining that in a reverse confusion case, the intent inquiry must "focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark"); Kos, 369 F.3d at 721 ("The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant."); Morgenstern Chem. Co., Inc. v. G.D. Searle & Co., 253 F.2d 390, 394 (3d Cir. 1958) (finding that defendant "trod a very narrow course when it adopted the name Mictine with full knowledge of the prior use of the name Micturin by the plaintiff"). A defendant that "persisted in its plan" to adopt a mark "after being warned of too close resemblance between" a proposed mark and plaintiff's mark is not "blameless." Kos, 369 F.3d at 721 (quoting Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 908 (3d Cir. 1952)).

In this case, Messrs. Ehst and Taylor testified that they first thought to change the name of New Century Bank in June or July 2009. In January 2010, Mr. Ehst conceived the idea of naming the bank "Customers 1st Bank." Shortly thereafter, in March 2010, New Century first became aware of Alliance's trademark registration for the mark CUSTOMER FIRST because it was listed on the Clearance Search commissioned by New Century's counsel. (Ehst, Tr. 06/17/10 at 172:13-173:1; 194:18-21.) It is clear, however, that New Century did not alter any of its plans to change the bank name after reviewing the Clearance Search and receiving an opinion of counsel (which Mr. Ehst did not read). (Id. at 200:1-25; Taylor, Tr. 06/17/10 at 242:16-18.) Rather, after receiving the Clearance

Search, Messrs. Ehst and Taylor discussed the possibility that Alliance might challenge New Century on its adoption and use of CUSTOMERS 1ST BANK, but Mr. Taylor did not believe that Alliance would sue. (Ehst, Tr. 06/17/10 at 174:23-177:3; Taylor, Tr. 06/17/10 at 294:16-295:1.)

New Century executives were aware that on April 20, 2010, the USPTO refused each of the five applications to register variants of the mark CUSTOMERS 1ST BANK on the basis that the marks depicted in the applications so resemble Alliance's mark CUSTOMER FIRST as to be likely to cause confusion or mistake or to deceive in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d). (Ehst, Tr. 06/1710 at 214:25-215:6; Pl. Exs. 7, 8, 9, 30, 31.)[18] Moreover, on April 30, 2010, Mr. D'Emilio, counsel for Alliance, sent a cease and desist letter to Mr. Taylor. (Pl. Ex. 3.) Despite receipt of this letter, New Century did not agree to stop using CUSTOMERS 1ST BANK as the name of its bank, and it is still using this name today. (Cirucci, Tr. 06/17/10 at 29:25-30:5.)

The catalyst driving New Century to suddenly change its name to Customers 1st Bank was the failure of New Century Bank of Chicago, Illinois, on April 23, 2010. Upon hearing the news that a "New Century Bank" had been seized and placed into receivership, Mr. Sidhu directed Messrs. Taylor and Ehst to immediately change the name of the bank from New Century to CUSTOMERS 1ST BANK. (Ehst, Tr. 06/17/10 at 190:25-191:6.) This impetuous decision is at odds with New Century's original plan to transition to the name CUSTOMERS 1ST BANK over the summer of 2010. Originally, New Century did not intend to change signs in existing branches to CUSTOMERS 1ST BANK until August 2010, after a shareholder vote on the name change. It seems that

---

[18]On May 19, 2010, after a response was filed by New Century to the declinations, the USPTO once again refused to approve for registration the marks sought in New Century's Application Serial No. 77/952,243, Application Serial No. 77/952,250, and Application Serial No. 77/952,252. The refusal was based on the same reasons for the original decision.

CUSTOMERS 1ST BANK still will not officially become the legal name of New Century until late July or August 2010. (Id. at 167:3-24.) Contrary to this plan, New Century impulsively issued a press release on April 26, 2010, publicizing its new name.

Regardless of New Century's motivation to abruptly change course and whether it acted in good faith, New Century acted hastily in an effort to separate itself from the negative publicity surrounding the failure of New Century Bank of Chicago. Even before conducting a trademark clearance search or receiving any opinion from counsel as to the propriety of using CUSTOMERS 1ST BANK, New Century imprudently decided to adopt the mark and invest considerable sums of money on changing its name. Alliance should not be punished for New Century's precipitous behavior. After New Century executives learned about the registration of the mark CUSTOMER FIRST, they still continued to use their mark with knowledge of the probability of this lawsuit. Under these circumstances, the factor "Intent of Defendant" weighs in favor of Alliance.

f.      Factor 6: <u>Evidence of Actual Confusion</u>

Evidence of actual confusion "is difficult to find. . .because many instances are unreported." <u>Checkpoint</u>, 269 F.3d at 291. While proof of actual confusion is "often deemed the best evidence of possible future confusion," it is not considered essential. <u>Attrezzi, LLC v. Maytag Corp.</u>, 436 F.3d 32, 40 (1st Cir. 2006). For the purposes of a preliminary injunction motion, the holder of a trademark need only show likelihood of confusion, not actual confusion. <u>Versa Prods.</u>, 50 F.3d at 205; <u>Borinquen</u>, 443 F.3d at 120-21.

As discussed above in relation to Factor 4 (the length of time Defendant has used the mark), there has been no evidence of actual confusion since April 26, 2010, the date on which New Century announced that it had changed its name to Customers 1st Bank. However, New Century's

transformation to Customers 1ˢᵗ Bank is not complete, and permanent signs displaying the name

Customers 1ˢᵗ Bank at its branches have not yet replaced signs with the name New Century Bank.

Because Alliance Bank need only show likelihood of confusion and not evidence of actual confusion

to prevail on a motion for preliminary injunction, and because not enough time has elapsed during

which both marks were used, this Court will not afford any weight to Lapp Factor 6.

> g.  Factor 7: Whether Goods Are Marketed Through the
> Same Channels and Factor 8: Extent to Which Targets
> of the Parties' Sales Efforts are the Same

"[T]he greater the similarity in advertising and marketing campaigns, the greater the

likelihood of confusion." Checkpoint, 269 F.3d at 288-89 (quoting Acxiom, 27 F.Supp.2d at 502).

Similarly, when the parties target their sales efforts to the same group of consumers, there is a greater

likelihood of confusion between the two marks. Id. This is a "fact intensive inquiry" that requires

a court to examine the "media the parties use in marketing their products as well as the manner in

which the parties use their sales forces to sell their products to consumers." Id. at 289.

As to Factor 7, Alliance and New Century both offer community banking services in

overlapping geographical markets and over the internet.  Both parties provide banking services

through area branches and target consumers in Chester and Delaware Counties in Pennsylvania.

Accordingly, Factor 7 clearly weighs in favor of Alliance and in favor of a finding of likelihood of

confusion.

As to Factor 8, the types of advertising media used by each party also overlap.  To date, a

large part of the marketing by both parties has been over the Internet, through direct mailings to

households in Chester and Delaware Counties and with promotional signage in and around bank

branches.  Despite the fact that Alliance advertises in direct mailings through ValPak, and New

Century advertises through Clipper, it is a fair inference that some households receive both promotional offerings. Moreover, Alliance advertises on bus shelters and in newspapers in Chester and Delaware Counties, where New Century also does business and advertises. Even New Century's in-store signs have the potential to confuse consumers, considering the proximity of two branch locations of New Century to branch locations of Alliance.[19] Consequently, given all these circumstances, Factor 8 also weighs in favor of a finding of likelihood of confusion.

> h.    Factor 9: <u>Relationship of the Goods in the Minds of Consumers</u>

When considering Factor 9, "[t]he question is how similar, or closely related, the products are." <u>Kos</u>, 369 F.3d at 722-23. "The closer the relationship between the products. . .the greater the likelihood of confusion." <u>Lapp</u>, 721 F.2d at 462. "The near-identity of the products" or their "similarity of function" are key to assessing whether consumers may see the products as related. <u>A & H</u>, 237 F.3d at 215. In other words, "the question is whether the consumer might. . .reasonably conclude that one company would offer both of these related products." <u>Fisons</u>, 30 F.3d at 481; <u>see also Checkpoint</u>, 269 F.3d at 286 (a court may consider "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source[,] affiliation or sponsorship").

As discussed at length above, the banking and financial products offered by Alliance and New Century are closely-related, in competition and nearly identical. Consequently, this factor weighs in favor of finding a likelihood of confusion.

------------

[19]The closest New Century branch to an Alliance branch is located in Newtown Square, where the two are directly across the street from one another. Also, a New Century branch in Wayne is three and one half (3.5) miles away from an Alliance branch in Paoli. (Cirucci, Tr. 06/17/10 at 31:4-12.)

i.      Factor 10:  Other Facts Suggesting the Public Might
        Expect the Prior Owner to Manufacture Both Products

"In making this final determination under the Lapp test, courts should 'look at the nature of the products or the relevant market, the practices of other companies in the relevant fields, [and] any other circumstances that bear on whether consumers might reasonably expect both products to have the same source.'" Sabinsa, 2010 WL 2705162, at *10 (quoting Kos, 369 F.3d at 724). "Under this factor we look not only to evidence that a plaintiff has actually moved into the defendant's market, but also to 'other facts suggesting that the consuming public might expect the prior owner to manufacture a product in defendant's market, or that it is likely to expand into that market.'" Checkpoint, 269 F.3d at 290 (quoting Lapp, 721 F.2d at 463).

This factor encompasses the discussion of prior Lapp factors, *supra.* No other facts need to be added to support the conclusion that New Century's mark CUSTOMERS 1ST BANK creates the likelihood of confusion and the strong inference that the mark infringes on Alliance's mark CUSTOMER FIRST.

j.      Balancing of Factors

Once each of the relevant Lapp factors has been considered, a court must balance the factors and "determine whether in the totality of the circumstances marketplace confusion is likely." Checkpoint, 269 F.3d at 296. Under the totality of the circumstances in this case, the Court finds confusion is more than likely. The similarity of the marks (Factor 1), the most important factor in the likelihood of confusion analysis, and the similarity of the parties' services (Factor 9), weigh heavily in favor of a finding of likelihood confusion. Furthermore, the similarity of the channels of trade (Factor 7), the consumers targeted by the parties (Factor 8), the relative strength of Alliance's

mark (Factor 2), and New Century's intent in adopting its mark (Factor 5) also weigh in favor of a likelihood of confusion. The factors relating to consumer care (Factor 3), actual confusion (Factor 6), and length of time New Century used its mark without actual confusion (Factor 4) are relatively neutral and are not given considerable weight in the likelihood of confusion analysis. On balance, it is clear that New Century's use of CUSTOMERS 1ST BANK is likely to cause confusion, and Alliance is likely to succeed on the merits of this case.

B.    <u>Irreparable Harm to Alliance</u>

In order to prove irreparable harm, Plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." <u>Acierno</u>, 40 F.3d at 653 (quoting <u>Instant Air Freight Co.</u>, 882 F.2d at 801). "Economic loss does not constitute irreparable harm." <u>Acierno</u>, 40 F.3d at 653. "[T]he injury created by a failure to issue the requested injunction must 'be of a peculiar nature, so that compensation in money cannot atone for it[,]'" and the word irreparable connotes "'that which cannot be repaired, retrieved, put down again [or] atoned for.'" <u>Id.</u> (internal quotations omitted). The claimed injury cannot merely be possible, speculative or remote. <u>Heritage Community Bank</u>, 2008 WL 5170190, at *2. "The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; an injunction may not be used simply to eliminate a possibility of a remote future injury.'" <u>Acierno</u>, 40 F.3d at 655 (quoting <u>Cont'l Group, Inc. v. Amoco Chems. Corp.</u>, 614 F.2d 351, 358 (3d Cir. 1980)).

In a trademark infringement case, the Third Circuit explained:

> "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Lack of control over one's mark "creates the potential for damage to...reputation [, which] constitutes

> irreparable injury for the purpose of granting a preliminary injunction
> in a trademark case." Thus, "trademark infringement amounts to
> irreparable injury as a matter of law." "[O]nce the likelihood of
> confusion caused by trademark infringement has been established, the
> inescapable conclusion is that there was also irreparable injury."

Kos, 369 F.3d at 726 (internal citations omitted); see also McCarthy § 30:47 (explaining that potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case); S & R Corp., 968 F.2d at 378 ("Finally, and most importantly for this case, trademark infringement amounts to irreparable injury as a matter of law.").

Since this Court has concluded that there is a likelihood of confusion between the marks, see section IV(A)(ii), there likewise would be irreparable injury to Plaintiff if a preliminary injunction is not granted at this time.

Furthermore, equitable considerations warrant the issuance of a preliminary injunction in this case. See Ebay, Inc. v. Mercexchange, LLC, 547 U.S. 388, 392-93 (2006). Over the past four (4) years, Alliance has built a reputation in the relevant market by providing community banking services under the mark CUSTOMER FIRST. Alliance has spent considerable time, money, and effort developing its services and relationships with customers under the "hub" of CUSTOMER FIRST. New Century's use of CUSTOMERS 1ST BANK as a name and mark in connection with nearly identical community banking services has and will irreparably harm Alliance by precluding it from exercising full control over its business reputation and good will. See Opticians, 920 F.2d at 195 ("[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods.") (internal citations omitted). Accordingly, this factor weighs in favor of Alliance.

C.     <u>Irreparable Harm to New Century</u>

In evaluating claims of irreparable harm to the defendant if the injunction is issued, the Third Circuit has looked to evidence of potential financial loss, whether the financial loss was self-imposed based on the choice of business name, and whether the defendant had any prior knowledge of the potential infringement. <u>See</u> <u>Opticians</u> 920 F.2d at 197 (finding that a party "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself"); <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 290 F.3d 578, 596 (3d Cir. 2002). In describing irreparable harm, the Supreme Court has explained:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

<u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974) (quoting <u>Virginia Petroleum Jobbers Ass'n v. FPC</u>, 259 F.2d 921, 925 (D.C. Cir. 1958)).

New Century estimates that the issuance of an injunction would cost the bank hundreds of thousands of dollars it expended on changing its name to Customers 1st Bank. (Taylor, Tr. 06/17/10 at 274:20-275:22.) However, "District Courts should consider financial damages when establishing and setting the bond for an injunction, not when deciding whether to grant it." <u>Kos,</u> 369 F.3d at 728. The costs for New Century to rename the bank, revise advertising materials, and create a new mark are compensable by money damages and do not constitute irreparable harm as a matter of law. New Century also argues that enjoining it from changing its name to Customers 1st Bank will affect its reputation and goodwill. As noted above, the Court has found that the transition from New Century

to Customers 1st Bank is still in progress, the legal name of the bank will not change until about August 2010, and New Century adopted CUSTOMERS 1ST BANK when its executives had knowledge of Alliance's registration and established use of the mark CUSTOMER FIRST. Consequently, the balance of harm in this case supports Alliance's entitlement to injunctive relief.

D. The Public Interest

"Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." Opticians, 920 F.2d at 197. "Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." S & R Corp., 968 F.2d at 379. Since this Court has concluded that there is a likelihood of confusion between the marks, see section IV(A)(ii), there likewise would be harm to the public interest if a preliminary injunction is not granted at this time.

V. ALLIANCE IS REQUIRED TO POST A BOND

Fed. R. Civ. P. 65(c) states in relevant part: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Accordingly, the Court will require that Plaintiff post a bond in the amount of $150,000.

VI. CONCLUSION

After evaluating the Lapp factors, this Court concludes that there is a likelihood of confusion between Alliance's mark CUSTOMER FIRST and New Century's mark CUSTOMERS 1ST BANK. As a result, this Court finds that Alliance is likely to succeed on the merits of this trademark infringement case under the Lanham Act, and Alliance will be irreparably harmed if a preliminary

56

injunction is not granted.  Similarly, the likelihood of confusion would result in harm to the public if a preliminary injunction does not issue.

Alliance's request for a preliminary injunction prohibiting Defendant New Century Bank from using the name "Customers 1st Bank" or any similar name in commerce, and ordering Defendant New Century Bank to retract and impound all labels, signs, prints, packages, and advertisements bearing the name "Customers 1st Bank" or any variation will be granted. Accordingly, for the foregoing reasons, the Court will grant Plaintiff Alliance Bank's Motion for Preliminary Injunction.  An appropriate Order follows.